NATIONAL IRANIAN TANKER COMPANY (NEDERLAND), N. V., Owner of the TANK VESSEL REZA SHAH THE GREAT, Plaintiff-Appellee,

v.

The TUG DALZELL 2 and Richard Joyce Smith, William J. Kirk and Harry W. Dorigan, as Trustees of the property of the New York, New Haven & Hartford Railroad Company, Defendants-Appellants.

No. 486, Docket 32662.

United States Court of Appeals Second Circuit.

Argued May 8, 1969.

Decided May 29, 1969.

Donald M. Waesche, Jr., Bigham, Englar, Jones & Houston, New York City, for appellants.

Stanley R. Wright, New York City (Burlingham, Underwood, Wright, White & Lord, Robert B. Pohl, New York City, of counsel), for appellee.

Before MOORE, FRIENDLY and HAYS, Circuit Judges.

FRIENDLY, Circuit Judge:

This action was brought in the District Court for the Southern District of

New York by National Iranian Tanker Co., owner of the tanker Reza Shah the Great, against a tug and its operators, for damages to the tanker resulting from a collision in Hell Gate. Judge Bonsal found the tug solely responsible, 284 F.Supp. 451, and the tug and its operators appeal from an interlocutory decree establishing liability, 28 U.S.C. § 1292 (a) (3). Not disputing that the tug was at fault for failure to blow a danger signal, 33 U.S.C. § 203, Rule III, appellants contend that the court wrongly absolved the tanker of violating the Narrow Channel Rule, 33 U.S.C. § 210. This provides that "in narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel * * *."

In passing northward through Hell Gate, the tanker, a vessel 665' long, was required to turn sharply to starboard to round Hallets Point on the Long Island shore and avoid Negro Point on Wards Island, and then gently to port to follow the channel and avoid the Long Island shore. While south and west of Negro Point, she sighted a flotilla navigating southward, consisting of the tug and two carfloats, the NH 65 on the tug's port and the NH 68 on the tug's starboard. The flotilla was on its proper side of the channel and the tanker blew a port-to-port passing signal, 33 U.S.C. § 203, Rule I, which was not answered. Shortly thereafter the tanker "observed the flotilla begin to turn on its own axis in crab fashion with the port stern of the NH 65 swinging to her port out into the channel * * *." 284 F.Supp. at 453. This resulted from the captain's having put the tug's engines at stop and her wheel to starboard, id. at 456. As the flotilla approached the Triborough Bridge, "the movement towards mid-channel continued and became more rapid," id. at 453. The tanker blew a danger signal and took avoiding action, not criticized by the tug, but the NH 65 hit the port side of the tanker some 80' from her bow and the weight of the flotilla forced her onto the Long Island shore.

The court found that the collision occurred on the tanker's side of the channel. It faulted the tug for failure to keep the flotilla on their own side and also for failing to blow a danger signal, 33 U.S.C. § 203, Rule III, when she became concerned over the tanker's navigation. While the tug challenges the finding on the locus of the collision with the bow of the tanker, we have no question on that score; even if at the moment of collision the tanker's stern protruded slightly over mid-channel, concerning which the judge found himself in doubt, 284 F.Supp. at 454, this was the result of a right rudder ordered in an effort to avoid the threat caused by the tug's faults, was in the course of being corrected, and had no causal relation with the collision.

Somewhat more impressively the tug contends that her own maneuver was caused by the tanker's having been on the wrong side of the channel when the tug first sighted her across Negro Point. The court seems to have found the contrary, saying in one passage that the tanker navigated around Hallets Point "to her starboard of the middle of the channel," and in another "When the flotilla was first observed by the tanker, the tanker was in the middle or slightly to her starboard of the middle of the channel * * *." 284 F.Supp. at 453 & nn. 2 & 3. Appellants say this is inconsistent with a further finding that at that time "right rudder was ordered [by the tanker], and she proceeded on a course which *would bring her towards the middle of the channel* under the Triborough Bridge." (Emphasis supplied.) But the judge had found that the sighting occurred "when the tanker had just rounded Hallets Point," which places this maneuver at a point where the channel continued its sharp right swing. Right rudder was necessary to enable the tanker to follow the channel, and the statement that she

would be at mid-channel as she passed under the Triborough Bridge is consistent with her having followed the middle of the channel during her entire swing. We thus do not read the judge's words as carrying any necessary implication that the tanker was crossing *from the left* of mid-channel toward the right. Appellants also point to the court's acknowledgment that "there was evidence that prior to the collision the tanker may have navigated at mid-channel or partially on her port side of the channel when she rounded Hallets Point and as she made her approach to the Triborough Bridge." *Id.* at 456–457. We understand this simply as noting the existence of such evidence, not as indicating any doubt with respect to the finding that the tanker had never crossed the mid-channel line. While we could not hold such a finding to be clearly erroneous, we need not rest decision on that ground. Even if we should assume *arguendo* that in navigating the sinuous course around Hallets Point the tanker had encroached slightly on the port side of the channel, she was following the "safe and practicable" course within 33 U.S.C. § 210, see 284 F.Supp. at 457 n. 7. She was entitled to presume that the flotilla would keep to its side of the channel, and the tug had no basis for believing that the tanker, after completing her turn, would not return to the starboard side in the nearly half-mile that remained between them, see The Victory & The Plymothian, 168 U.S. 410, 426, 18 S.Ct. 149, 42 L.Ed. 519 (1897). If the tug entertained any doubts about the tanker's intention, the proper response would have been to sound a danger signal that would have alerted the tanker, rather than to navigate in a manner enhancing the feared danger.

Since the conclusion that the tug was solely at fault is supportable on the grounds stated, we need not pass upon other reasons advanced by the district judge to justify refusal to divide the damages.

Affirmed.